[Civ. No. 2100. Fifth Dist. Dec. 31, 1973.]

JONATHON LAWRENCE JACOBS, Petitioner, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Badger, Mower & Watson and James P. Mower for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, Doris H. Maier, Assistant Attorney General, Charles P. Just, Janice Hayes, and Arnold O. Overoye, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**BROWN (G. A.), P. J.**—This cause is before us on a petition for a writ of mandamus filed pursuant to Penal Code section 1538.5 after petitioner's motion to suppress was denied by the trial court. He is charged with violating Health and Safety Code section 11357 (possession of marijuana). The evidence he seeks to suppress is that which a police officer visualized and the fruits thereof when the officer peeked through an aperture in a venetian blind into a closed business establishment at about 8:40 p.m. on March 27, 1973.

Sanders' Meat and Locker Service is a retail business located at 1220 South Avenue in the City of Turlock. There is a customer parking area in front of the building. The front entrance consists of two double swinging, uncovered glass doors leading into the lobby. To the left of the lobby is a workroom which has a large plate glass window facing the parking lot. Beneath that window, between the edge of the paved parking lot and the wall, is a planter area about three feet wide which is substantially flush with the parking lot pavement. The planter area is not a common walkway or pathway. The rest of the building consists of offices, locker space and processing plant.

On March 17, 1973, at about 7:40 p.m., Officer Lilly of the Turlock Police Department was on routine patrol in the area of the Sanders' Meat and Locker Service. As he passed the Sanders building he noticed a light blue Mustang parked in the parking lot adjacent to the building. He recognized the vehicle, having seen it parked there on many prior occasions during the daytime. He was not sure whether he had previously seen this vehicle parked there at that hour of the evening. He also noticed that a light was on in the area of the building later identified as the workroom. Although the business was closed for the day, these circumstances alone did not arouse his concern for the safety of the building.

At about 8:40 p.m. Officer Lilly again drove by the Sanders building. This time he noticed a second car parked in the lot near the blue Mustang and also noticed that the light in the workroom was still on. There was nothing unusual or suspicious about the way the cars were parked. The additional factor, however, of a second car being parked there aroused his concern for the safety of the building. Consequently, he notified Sergeant Mueller by radio and informed him of the situation. The two officers met about a quarter of a mile away from the building for the purpose of discussing the matter, and at that time Officer Lilly disclosed to Officer Mueller what he described as suspicious circumstances at the building.

The two officers then proceeded to the Sanders building and parked their patrol cars near the other two vehicles in the parking lot. They did not attempt to notify Mr. Sanders though they knew he was the owner of the building. As Sergeant Mueller emerged from his patrol car he heard music, loud conversation and laughter coming from the portion of the building where the light was on. Sergeant Mueller then went to the window where the noise was coming from to investigate the situation. In doing so he walked across the parking lot and, in order to look through the window, stepped onto the planter area.

The large plate glass window at the front of the workroom was covered by sheer curtains and venetian blinds which were drawn completely closed. Sergeant Mueller stated that from the way the blinds were situated there had been an obvious effort to close them completely.

Due to an apparent defect in the venetian blinds there was an opening or aperture in the blinds of about one and one-half to two inches at approximately eye level. By standing in the planter area no more than a foot away from the window, Sergeant Mueller could see into the workroom. He saw petitioner and one Thomas Volk[1] smoking marijuana. He would not have been able to observe this activity if the blinds had not been defective and if he had not been within a foot of the window.

After Sergeant Mueller had observed petitioner and Volk smoking marijuana for a short time, Volk left the workroom and entered the lobby area, whereupon Mueller gained his attention and had him open the front door from the inside. Petitioner and Volk were then placed under arrest. As a result of a subsequent search of the workroom the officers picked up marijuana and various items of paraphernalia, all of which is sought to be suppressed as the poisonous fruit of the illegal viewing by Sergeant Mueller.

We are, of course, bound by the factual findings of the trial court. ██ However, the trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the Constitution. " '. . . Although that issue is a question of law, the trial court's conclusion on the point should not lightly be challenged by appeal or by petition for extraordinary writ. (Fn. omitted.) Of course, *if such review is nevertheless sought, it becomes the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.*' (Italics added; [citation].)" (*People* v. *Gale* (1973) 9 Cal.3d 788, 793 [108 Cal.Rptr. 852, 511 P.2d 1204].)

Following this mandate, we have concluded as a matter of law that the facts and circumstances did not warrant the surreptitious peering into the window by the officer.

██ The basic test as to whether there has been an unconstitutional invasion of privacy is whether the person has exhibited a subjective expectation of privacy which is objectively reasonable and, if so, whether

---

[1]Thomas Volk is the nephew of the owner of the building and was working there that night making identification tags.

that expectation has been violated by unreasonable governmental intrusion. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 84-86 [81 Cal.Rptr. 857, 460 P.2d 129]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1100 [80 Cal.Rptr. 633, 458 P.2d 713].) This test of reasonableness is dependent upon the totality of facts and circumstances involved in the context of each case. (*North* v. *Superior Court* (1972) 8 Cal.3d 301, 308-312 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *Dillon* v. *Superior Court* (1972) 7 Cal.3d 305, 310-311 [102 Cal.Rptr. 161, 497 P.2d 505]; *People* v. *Sneed* (1973) 32 Cal.App.3d 535, 540 [108 Cal.Rptr. 146].)

 As to the first of the two facets of this test, we readily conclude that petitioner did exhibit a subjective expectation of privacy which was objectively reasonable. While under some conceivable circumstances there may be a difference between a private residence and a business establishment, under the facts here no rational foundation for such a distinction appears.[2]

Credible authority supports this conclusion. In *Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507], the court said: "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."

In *People* v. *Dumas* (1973) 9 Cal.3d 871, 881-882 [109 Cal.Rptr. 304, 512 P.2d 1208], our Supreme Court recently instructed: "The pattern of prior decisions suggests that one of the most crucial determinants of the validity of warrantless searches is the nature of the place subjected to search. This pattern has been created by the interweaving of constitutional concepts with fundamental human needs and expectations. The courts have implicitly recognized that man requires some sanctuary in which his freedom to escape the intrusions of society is all but absolute. [Fn. omitted.] Such places have been held inviolate from warrantless search except in emergencies of overriding magnitude, such as pursuit of a fleeing felon

---

[2]The Attorney General argues that petitioner could not have expected privacy from intrusions by janitorial personnel, late working employees or the owner. There was no evidence, however, that such persons frequented the premises at the hours here involved so as to dispel petitioner's expectation of privacy. Furthermore, a person may consent to observations from persons other than governmental agents while still maintaining an expectation of privacy from police intrusion. (*People* v. *Sneed, supra,* 32 Cal.App.3d 535, 541-542.)

[citation] or the necessity of action for the preservation of life or property [citations].[8]"

Footnote 8 provides: "Homes and *offices* clearly fall within this category of maximum protection [citations] as do hotel rooms [citations]." (Italics added.) (See *Dean* v. *Superior Court* (1973) 35 Cal.App.3d 112, 117 [110 Cal.Rptr. 585].)

Had the owner been in the workroom at night with the shades drawn to shut out peering eyes, his subjective expectation of privacy would have been objectively reasonable whether his purpose was to carry on a tryst, do after-hours work, or engage in any other activities, legal or illegal. We perceive no distinction in this connection between the petitioner and the owner as there is no evidence that petitioner's presence on the premises was other than as the invitee of an employee of the owner.

The existence of the aperture due to a defect in the blinds does not dispel the reasonableness of the expectation of privacy. As was said in *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 636 [108 Cal.Rptr. 585, 511 P.2d 33]: "The fact that apertures existed in the window, so that an unlawfully intruding individual so motivated could spy into the residence, does not dispel the reasonableness of the occupant's expectation of privacy. [Citations.] To the contrary, the facts of this case demonstrate that by drawing the window shade petitioner . . . exhibited a reasonable expectation to be free from surveillance conducted from a vantage point in the surrounding property not open to public or common use." (See *Pate* v. *Municipal Court* (1970) 11 Cal.App.3d 721, 724 [89 Cal.Rptr. 893].)

Passing to the second and more difficult facet of the test relating to the police officer's conduct, we must determine whether his actions constituted unreasonable governmental intrusion into the privacy of the workroom.

■ It is well settled that emergencies of overriding magnitude may justify a search conducted without prior judicial approval. (See e.g., *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642] —pursuit of a fleeing felon; *People* v. *Roberts* (1956) 47 Cal.2d 374,

377 [303 P.2d 721]—moaning sound from person in distress in apartment; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 735-741 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den. 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382]—murder of presidential candidate and fear of conspiracy to kill other political leaders; *People* v. *Gonzales* (1960) 182 Cal.App.2d 276 [5 Cal.Rptr. 920] —search of man for identification who was suffering from serious abdominal stab wounds; see also *Carrington* v. *Superior Court* (1973) 31 Cal. App.3d 635, 639-640 [107 Cal.Rptr. 546].)

However, where the circumstances confronting the officers do not justify the action taken, the courts have not hesitated to suppress evidence obtained as a result of that action. (See *Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 727 [91 Cal.Rptr. 569, 478 P.2d 1]; *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699, 706-707 [94 Cal.Rptr. 412, 484 P.2d 84]; *Flack* v. *Municipal Court* (1967) 66 Cal.2d 981, 991 [59 Cal.Rptr. 872, 429 P.2d 192].)

In making this determination, the courts have been careful to weigh the competing interests of the individual's privacy, the magnitude of the intrusion, and the degree of the necessity. As recently stated in *People* v. *Little* (1973) 33 Cal.App.3d 552, 557 [109 Cal.Rptr. 196]: "A balancing process is inevitably involved in which the magnitude of the officer's error is weighed against the magnitude of the intrusion of the suspect's privacy."

In the case at bench there was no emergency situation of overriding magnitude. Obviously the officers did not subjectively believe that there was such an emergency or that the building was imminently endangered. The light in the building and one car aroused no suspicion. The light and two cars caused the officer to believe that further investigation was warranted. However, he did so in a rather leisurely way—by meeting another officer a quarter of a mile from the building and then parking the police cars on the parking lot in plain view. Furthermore, the loud noises associated with levity from the interior of the workroom surely dispelled any notion that the occupants were engaged in a burglary. As stated in *Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 727 [91 Cal.Rptr. 569, 478 P.2d 1]: "[I]t would be most unusual for an unauthorized intruder to call attention to his presence with a musical accompaniment." (See also *People* v. *Stephens* (1967) 249 Cal.App.2d 113 [57 Cal.Rptr. 66].)

The surveillance of Sergeant Mueller would have been lawful if it had not been necessary to step into the small planter area between the building and the parking lot. For if the surveillance had been conducted from a vantage point where the officer had a right to be the observation would

come under the plain sight rule and thus not be considered a search. (See *People* v. *Boone* (1969) 2 Cal.App.3d 66, 69 [82 Cal.Rptr. 398]; *People* v. *Anderson* (1968) 266 Cal.App.2d 125, 131 [71 Cal.Rptr. 827]; *People* v. *Willard* (1965) 238 Cal.App.2d 292, 299 [47 Cal.Rptr. 734].) Accordingly, the short distance that Sergeant Mueller moved into the planter area to reach the window, though unlawful, was a relatively minor intrusion. (*People* v. *Willard, supra,* 238 Cal.App.2d 292, 299.) Nevertheless, the degree of the alleged "exigency" confronting the officers was likewise insignificant and thus does not overcome the illegality of their action.

Our Supreme Court, whose determinations we must follow, has refused to put its imprimatur upon surreptitious peeking where there is no overriding exigency or emergency and there are other plausible alternatives available. (*People* v. *Triggs* (1973) 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232]; *Lorenzana* v. *Superior Court, supra,* 9 Cal.3d 626.)

In *Triggs,* the police made clandestine observations of homosexual activity in an open public toilet stall from a plumbing access room; the court condemned the observations primarily due to the method of observation, because "[h]is clandestine observation of defendant, ' "prompted by a general curiosity to ascertain what, if anything," ' was going on within the restroom, was 'manifestly exploratory in nature, and violates both the letter and spirit of the Fourth Amendment.' [Citation.]" (8 Cal.3d at p. 895.)

Similarly, in *Lorenzana,* the court suppressed evidence obtained as a result of police peering through a two-inch aperture between drawn blinds and a windowsill while standing about six inches from the window in an area that was not a normal access route to the home.

In determining the reasonableness of the method selected by the police in conducting further investigation of suspicious circumstances, their surreptitious peeping through the window must be considered in light of alternative available courses of action. In this case, for example, the officer's conduct must be weighed against the alternatives of determining if the front door was locked, of attempting to visualize the activity through the uncovered front doors, of knocking on the front door to obtain entry and of calling police headquarters to have the owner contacted.

We do not hold that upon observing two cars parked on the premises and the lights on in the workroom the police were not justified in concluding that these were suspicious circumstances calling for further investigation; indeed, they might have been derelict in their duty if they had not done so.

(*People* v. *Parra* (1973) 30 Cal.App.3d 729, 732-734 [106 Cal.Rptr. 531]; *People* v. *Rhodes* (1971) 21 Cal.App.3d 10, 19 [98 Cal.Rptr. 249]; *People* v. *Hidalgo* (1970) 7 Cal.App.3d 525, 529 [86 Cal.Rptr. 660].) Nor do we deprecate the important responsibility of police officers as guardians of the security of the community and their function in protecting society against the criminal element who live by preying upon law-abiding citizens. (*People* v. *Murphy* (1959) 173 Cal.App.2d 367, 375-378 [343 P.2d 273].) We hold only that upon the particular facts of this case, where no overriding emergency or exigency was present and any suspicion of activity involving jeopardy to life or property should have been dispelled by the laughter, loud conversation and music from within, the officers did not act reasonably in walking into the planter area and surreptitiously peeking inside the building through the small aperture caused by a defect in the venetian blinds. That action was an unreasonable invasion of petitioner's privacy in violation of Fourth Amendment proscriptions.

The order to show cause is discharged.

Let a peremptory writ issue directing respondent superior court to suppress the testimony of Sergeant Mueller with respect to that which he viewed through the window of the workroom and the evidence seized as the fruit of that activity.

Gargano, J., and Franson, J., concurred.

A petition for a rehearing was denied January 21, 1974, and the petition of the real party in interest for a hearing by the Supreme Court was denied March 8, 1974. McComb, J., Burke, J., and Clark, J., were of the opinion that the petition should be granted.