[Crim. No. 4239. Fifth Dist. Feb. 6, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK EUGENE LOVELACE, Defendant and Appellant.

COUNSEL

Brunn, Lacey & Thayer and Dale H. Thayer for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Garrick W. Chock, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ZENOVICH, J.—The appeal before us is from a judgment rendered against appellant upon his plea of guilty to possession of amphetamines for sale (Health & Saf. Code, § 11378). He had first entered pleas of not guilty to each of three counts alleging (1) possession of phenobarbital for sale (Health & Saf. Code, § 11378), (2) possession of amphetamines for sale (Health & Saf. Code, § 11378) and (3) planting, cultivating, harvesting, drying and possession of marijuana (Health & Saf. Code, § 11358). He then moved under Penal Code section 1538.5 to suppress physical evidence as to each count and to traverse the search warrant. When the motion was denied, he withdrew his plea of not guilty and pleaded guilty to one of the counts; the other counts were dismissed.

In this appeal, he challenges the denial of his suppression motion. The pertinent evidence is contained in the affidavit in support of the search warrant, the transcript of the preliminary hearing, and the oral testimony adduced at the suppression hearing.

In his affidavit in support of the search warrant, Stanislaus County Deputy Sheriff Tom Ford stated that he was informed by a confidential, reliable informant that several marijuana plants could be seen growing in the backyard of a residence located at Maynell Street. The informant told Ford that the plants could be seen from an alleyway running between the residence and an establishment named Deluxe Cleaners. Three days before execution of the warrant affidavit, Ford went to the described residence ·and found the address to be 116 Maynell. The affidavit then described the following observations by Ford: "From the public alleyway between Deluxe Cleaners and the residence at 116 Maynell I was able to observe the back yard of 116 Maynell through numerous gaps and knotholes in the fence surrounding the back yard. I noted at the southwest corner of a garage and next to the fence and alleyway, several marijuana plants numbering at least four, ranging from three to five feet tall. These plants appear to have been well cared for and appear to have been specifically planted in that location as there are no other marijuana plants within the back yard. I noted that the ground around the base of the plants was moist, with the plants appearing to have been watered. I noted that these marijuana plants had the characteristics of the marijuana plant in its growing state, being medium to dark green in color and have saw toothed edge leaves. Being an expert on the identification of growing marijuana plants, it is my opinion that the plants observed by your affiant were, in fact, marijuana plants in their growing state.

"As an experienced narcotics officer I can also say that in the past on numerous occasions regarding the cultivation of marijuana that I have found amounts of marijuana plants inside of a residence and outbuildings on the property being cured and manicured for the use and sale of these plants. I can further say that marijuana grown by private individuals is picked and commonly taken into residences and outbuildings to be dried and manicured. I have further found that individuals involved in the cultivation of marijuana plants keep inside of their residence and outbuildings marijuana seeds. As an expert on the identification of marijuana I can also state that marijuana is usually hung and dried out of view of the public. Marijuana is also frequently manicured and packaged for use and for sale and this requires all types of implements

and is also generally done out of the view of the public. For those reasons I believe that there can now be found inside of the residence at 116 Maynell, Modesto, California, marijuana and the implements used to cultivate and package marijuana for use or sale." Upon further investigation, Ford found that the utilities of the residence were in the name of an individual named James Lovelace and that appellant Patrick Lovelace had been previously suspected of furnishing marijuana to a juvenile. Based upon this information, the magistrate issued a warrant for the search of the "buildings and grounds" at 116 Maynell.

On October 3, 1978, Modesto Police Officer Joe Massey and three other individuals executed the search warrant upon 116 Maynell. Before knocking on the door of the residence, Massey stood in the public alleyway about five feet from the fence and observed what appeared to be "at least a half a dozen [marijuana] plants" in the backyard. Massey said he made this observation by looking through cracks and gaps in the fence.[1] Massey testified that a solid wood fence kept the backyard area secluded from the alleyway. In response to an inquiry about whether a reasonable person would be able to see through the fence without endeavoring to do so, the officer responded, "that would depend on where you were standing."[2] After knocking on the door of the residence, appellant answered and the officer explained the purpose for his presence. Appellant, his mother and Willis McCoy (a friend of appellant's mother) were in the residence when officers engaged in execution of the warrant.[3] During a search, Massey found phenobarbital, amphetamines, marijuana seeds and leaves, a book on marijuana cultivation, drug paraphernalia, a lid of marijuana in a cigar box, and a three-foot-long dried limb of marijuana hanging from the rafters in the garage. Contrary to his initial observation about seeing "half a dozen plants there," the officer discovered that there was only *one* marijuana plant in the backyard.[4] Massey described the plant as follows: "[I]t had

---

[1]Massey testified that he did not have to get up close to the fence in order to see the marijuana plants in the backyard.

[2]Nonetheless, Massey indicated that the fence gave a solid appearance.

[3]At the suppression hearing, McCoy testified that he was living with appellant's mother at the time. He stated that he had lived there approximately three months prior to the warrant's execution.

[4]In explaining why he thought there was more than one plant in his initial viewing, the officer explained: "Q. At that time when you first observed it through the fence, can you tell us did you determine at that time that it was only one plant?

"A. No.

"Q. Can you tell us what you determined based upon that observation as to the number of plants that you were observing through the fence?

large branches coming off probably at least four larger branches coming up off of it spreading out to probably a width of at least four foot. So it would be a plant approximately five-foot tall with an expansion of at least four foot. It was very huge like maybe a bush." He also noted that "it had grown so tall it had fell [*sic*] over, and the top of it was laying towards the ground; and it covered at least a four-foot circle underneath it." Since the plant weighed five pounds, it left a sizable hole after it was removed by executing officers. Massey also testified that no other marijuana stumps were in the area. There was also no freshly turned soil in the ground adjacent to the sole marijuana plant.

Doris Lovelace, appellant's mother, testified at the preliminary examination. She initially indicated that the fence had a height of about six feet. Mrs. Lovelace indicated that she *personally* could not see over the top of the fence when she was standing in the alleyway.[5] It was her opinion that the fence was built for purposes of privacy. Mrs. Lovelace testified that appellant moved into the house in May 1977, and that her husband rebuilt the fence around November of the same year. In describing why the fence was repaired by her husband, Mrs. Lovelace stated, "It was in bad shape, and the posts were beginning to break off and fall down; and it was beginning to fall down, and we wanted a solid fence there for the privacy from the people around us because like I said we're so close to businesses there that there's so many people there, so much traffic in our area."

---

"A. When I looked at it, I figured there was at least a half a dozen plants there.

"Q. And why did you draw that conclusion?

"A. Because you could see the tops of all the plants, and they were standing. It looked like the tops of all the plants, and they were about four foot from the ground, at least four or five feet from the ground.

"Q. And it wasn't until you went in there and actually tried to dig it up you realized that those were not individual plants but rather limbs of one other plant?

"A. That's correct."

[5]Subsequently, Mrs. Lovelace clarified her earlier testimony: "Q. To be able to see through that fence to your observation, Mrs. Lovelace, how close would you have to be to it?

"A. I think you'd have to get right up to it and see through it. I don't think you could stand two foot [*sic*] away from it and see anything because it's solid.

"Q. You say 'think,' you're speaking of your observations?

"A. Yes, right.

"Q. You have not been able to see anything through it from your observations?

"A. No.

"Q. If you got right up to it, you could peer into the backyard, couldn't you?

"A. Yes, if you got right up with your eyes and looked through the fence, you could probably see."

The following additional facts were adduced at the suppression hearing. Deputy Ford stated that he stood within one foot of the fence (with his face within an inch or two of it) when he saw the marijuana. Although he could neither see over nor under the six-foot-high fence, Ford looked through a one-inch-wide knothole that was seven feet from the marijuana; furthermore, he also viewed the backyard through another knothole and one-quarter-inch gaps between the fence boards. In explaining why his affidavit contained the statement about seeing several marijuana *plants*, Ford stated, "I saw what *appeared to me* to be several marijuana plants, numbering at least four." (Italics added.) The court sustained objections to defense counsel's inquiry into the officer's knowledge of the *Pellegrin*[6] decision. Ford also testified that he viewed the marijuana through gaps in a board which were located near the bottom of the fence. Moreover, by looking through the lower gaps in the fence, Ford noted that the ground around the base of the marijuana was moist.

Massey, McCoy and Doris Lovelace also provided testimony at the suppression hearing. Massey reiterated his statement that there appeared to be several plants when he first viewed the backyard area from the alleyway.[7] Upon closer examination, however, Massey conceded that there was only one marijuana plant in the backyard. McCoy testified that he repaired the backyard fence sometime in the summer of 1977. The reason for doing so was because "The fence was in a somewhat rundown condition at that time. And due to the proximity, the location so close to a commercial alley and McHenry Avenue, and the traffic on Saturday nights, we felt weed [*sic*] like to have a little more privacy in our backyard." McCoy also indicated that he repaired the fence so that it was relatively "tight." He stated that the purpose of a solid fence was to shield the backyard from public view. McCoy described the particular area where the plant was located as being a "weed patch"; this area was located outside the concrete curbing that had been used to delineate a flower bed in the backyard. Mrs. Lovelace testified that she requested McCoy to make repairs to the fence, that she told him to construct it "as tight or as sound as possible," and that the repairs were made so that the backyard would be free from public view.

---

[6]*People* v. *Pellegrin* (1977) 78 Cal.App.3d 913 [144 Cal.Rptr. 421].

[7]Massey testified that his first glimpse occurred at a distance of six feet away from the fence. Nonetheless, he also observed marijuana by looking through cracks in the fence.

## DISCUSSION

Appellant's principal contention is that the trial court erred in denying the suppression motion because Officer Ford violated his reasonable expectation of privacy by peering through the knotholes and gaps in the fence at a very short range (two inches away).

■ The basic test to be applied in determining the nature of the right of privacy in cases such as the present one has been consistently stated as whether the person has exhibited a subjective expectation of privacy which is objectively reasonable and, if so, whether that expectation has been violated by unreasonable governmental intrusion. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 84 [81 Cal.Rtr. 457, 460 P.2d 129]; *People* v. *St. Amour* (1980) 104 Cal.App.3d 886, 891 [163 Cal.Rptr. 187]; *Burkholder* v. *Superior Court* (1979) 96 Cal.App.3d 421, 425 [158 Cal.Rptr. 86]; *Jacobs* v. *Superior Court* (1973) 36 Cal.App.3d 489, 493-494 [111 Cal.Rptr. 449].) This test of reasonableness is dependent upon the totality of facts and circumstances involved in the context of each case. (*Id.*, at p. 494.) ■ When contraband is plainly visible from a vantage point where law officers have a right to be, there can be no search in the constitutional sense. (See *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33]; *Burkholder* v. *Superior Court, supra*, 96 Cal.App.3d at p. 425.)

■ Although this court is bound by the factual findings of the trial court at the suppression hearing, the trial court also has the duty to decide whether the search was reasonable within the meaning of the Constitution. Such an issue is a question of law, and the ultimate responsibility falls upon the appellate court to measure the facts as found by the trier against the constitutional standard of reasonableness. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) ■ Upon a close examination of the facts before us, we are of the opinion that appellant has satisfactorily shown a reasonable expectation of privacy and unreasonable governmental intrusion.

The uncontradicted facts show that appellant and his family had a subjective expectation of privacy which was objectively reasonable. McCoy and Mrs. Lovelace both testified that the fence was repaired and tightened up in order to shield the backyard from public view.

Although there was an adjoining alleyway to the fenced area, they indicated the construction was undertaken for purposes of insuring privacy.[8]

In *Jacobs* v. *Superior Court, supra*, 36 Cal.App.3d at page 491, an officer peeked through an aperture in a venetian blind into a closed business establishment about 8:40 p.m. By standing in a planter area no more than a foot away from the window, the officer could see people smoking marijuana in the workroom of the closed business. (*Id.*, at p. 493.) Relying upon *Dean* v. *Superior Court* (1973) 35 Cal.App.3d 112, 117 [110 Cal.Rptr. 585], we found a reasonable expectation of privacy, stating, "'Homes and offices clearly fall within this category of maximum protection [citations] as do hotel rooms [citations].' ...[Par.] Had the owner been in the workroom at night with the shades drawn to shut out peering eyes, his subjective expectation of privacy would have been objectively reasonable whether his purpose was to carry on a tryst, do afterhours work, or engage in any other activities, legal or illegal." (*Jacobs* v. *Superior Court, supra*, 36 Cal.App.3d at p. 495, italics deleted.)

Similar reasoning has been used to sustain expectations of privacy in other cases. (See e.g., *Lorenzana* v. *Superior Court, supra*, 9 Cal.3d at pp. 629-630, 634-635 (police officer made observations through gap between windowsill and window shade; no view into house until officer was within five or six inches of window; officer placed face within an inch of window while making observations); *Burkholder* v. *Superior Court, supra*, 96 Cal.App.3d at pp. 428-429 (officer ignored posted "no trespassing" signs and unlocked several gates along a rural access road in order to reach a wire-enclosed marijuana patch); *Phelan* v. *Superior Court* (1979) 90 Cal.App.3d 1005, 1011-1012 [153 Cal.Rptr. 739] (marijuana garden in isolated mountainous ravine protected by trees and a four-foot wire fence covered with brush and branches; officers acknowledged that owners intended to conceal it from view and that there was no indicia of common or public ownership); *People* v. *Fly* (1973) 34 Cal.App.3d 665, 667 [110 Cal.Rptr. 158] (officer impermissibly peered through an opening in the foliage which covered defendant's fence; officer had to squeeze into narrow area between a neighbor's garage and defendant's fence, which was blocked by foliage

---

[8]The People stress that the repair story accounted by McCoy and Mrs. Lovelace cannot be believed because the two accounts were inconsistent. Mrs. Lovelace stated that her husband repaired the fence in November 1977, while McCoy said that he repaired the fence in the summer of 1977. Although this is a divergence between the two stories, it is not major enough to render the fact of repair inherently improbable.

and weeds); *People* v. *Sneed* (1973) 32 Cal.App.3d 535, 543 [108 Cal.Rptr. 146] (governmental officials flew a helicopter at an unreasonably low height in order to look for marijuana plants; intruded into the "serenity and privacy of [an individual's] backyard").) Moreover, the privacy interest in one's backyard was aptly described by the court in *Dean* v. *Superior Court, supra,* 35 Cal.App.3d 112, 117: "Judicial statements like the foregoing disclose that mankind's common habits in the use of domestic and business property supply a prime measure of the reasonableness of expectations of privacy. (See also, cases summarized in *Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at pp. 631-634, and *People* v. *Sneed, supra,* 32 Cal.App.3d at pp. 541-542.) One who builds a swimming pool and sun-bathing area in his backyard expects privacy (hence immunity) from aerial inspection. Areas reasonably used in ordinary business operations are assumedly entitled to similar immunity. Such areas are expectedly private according to the common habits of mankind. So was the area exposed to helicopter surveillance in *People* v. *Sneed, supra;* to the *Sneed* court, the area was the occupant's 'backyard.' (32 Cal.App.3d at p. 542.)" (Accord *People* v. *Freeman* (1977) 66 Cal.App.3d 424, 432 [136 Cal.Rptr. 76], disapproved on other grounds in *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 257, fn. 13 [158 Cal.Rptr. 330, 599 P.2d 636].)

As shown by *Jacobs* and *Dean*, we are of the opinion that appellant and his family had a sufficient subjective expectation of privacy in the backyard. The repair of the six-foot-high fence demonstrated that it was objectively reasonable for appellant and his family to entertain such a subjective expectation of privacy.[9]

We now address whether Ford made his observations from a lawful vantage point.

---

[9]The People argue that the failure to cover the knotholes and gaps in the fence belie appellant's stated desire for complete privacy. This argument is unavailing in light of the fact that the fence was tightly constructed and designed to insure privacy. As similarly noted in *Jacobs*, "The existence of the aperture due to a defect in the blinds does not dispel the reasonableness of the expectation of privacy. As was said in *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 636 [108 Cal.Rptr. 585, 511 P.2d 33]: 'The fact that apertures existed in the window, so that an unlawfully intruding individual so motivated could spy into the residence, does not dispel the reasonableness of the occupant's expectation of privacy. [Citations.] To the contrary, the facts of this case demonstrate that by drawing the window shade petitioner ... exhibited a reasonable expectation to be free from surveillance conducted from a vantage point in the surrounding property not open to public or common use.' [Citation.]" (*Jacobs* v. *Superior Court, supra,* 36 Cal.App.3d at p. 495.) The defects in the fence likewise do not destroy appellant's expectation of privacy in the present case.

Officer Ford's oral testimony at the suppression hearing revealed that he observed the marijuana while his face was within an inch or two of the fence. From this perspective, he was able to see the marijuana through numerous knotholes and gaps in the boards of the fence.[10] Ford also stated that he was not able to see over or under the fence. Furthermore, the officer stated that he was only able to see portions of the marijuana plant through the knotholes, which suggests that the gaps and knotholes were of relatively small proportion.[11]

Notwithstanding the fact that the officer was at an initial lawful vantage point (i.e., the public alleyway), appellant contends that Ford's minute surveillance constituted an impermissible invasion into the privacy of appellant and his family. In response, the People argue that the officer had a legal right to peer through the gaps in the fence. An exploration of the case law indicates to us that Ford's observations were not made from a sufficient public vantage point.

Our Supreme Court in *Lorenzana* suppressed evidence obtained when police peered through a two-inch aperture between drawn blinds and a windowsill while standing about six inches from the window in an area which was not a normal access route to the house. The evidence in that case showed that the officer "placed his face within an inch of the window on the east side of the house" while monitoring the conversation therein. (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 630.) Although *Lorenzana* did not involve the public alleyway operable in the present case, the court stated: "All of the evidence produced at the preliminary examination and the suppression hearing demonstrated that the officers could not see into the residence from either the public street or the adjacent apartment driveway. Indeed [the surveilling officer] testified that he could neither see nor hear anything inside the Lorenzana home until he came within five or six inches of the window on the east side of the dwelling. The trial court's denial of defendants' motion to suppress can be sustained only by a finding that an implicit invitation offered by the observable characteristics of the house and surrounding property gave the officers the right to position themselves only six inches away from that window.... *None of [the] evidence could support a finding that normal approach to the Lorenzana home would*

---

[10]The officer testified that the knotholes were only an inch across, which tends to suggest that he had to be close to the fence for purposes of observing the marijuana.

[11]We have viewed certain slides and photographs of the fence admitted as exhibits below. They confirm that the gaps and knotholes were of minute dimensions.

*lead the public to within six inches of the window in question."* (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 635, italics added.)

In *People* v. *Fly, supra,* 34 Cal.App.3d 665, a narcotics officer made observations from a narrow area between a neighbor's garage and defendant's fence. The area was almost blocked by heavy foliage and weeds, and the fence was covered by vines. Using a telescope, the narcotics officer was able to see marijuana through an opening in the foliage. The appellate court affirmed the suppression of a warrant based on these observations, reasoning that " . . . the evidence supports the court's finding that the officer viewed the yard, on both occasions, from a vantage point as to which the defendants had a reasonable expectation of privacy. . . . The expectation created by the vines covering the fence was even greater by reason of the protection afforded at the vantage point selected by the officer [i.e., the narrow area between the neighbor's garage and defendants' fence]." (*Id.,* at p. 667.)

In *Jacobs,* we determined that there was no exigency justifying police surveillance a foot away from the window of a closed business establishment. Specifically, Presiding Justice Brown (speaking for this court) noted: "The surveillance of [the officer] would have been lawful if it had not been necessary to step into the small planter area between the building and the parking lot. For if the surveillance had been conducted from a vantage point where the officer had a right to be the observation would come under the plain sight rule and thus not be considered a search. [Citations.] Accordingly, the short distance that [the surveilling officer] moved into the planter area to reach the window, though unlawful, was a relatively minor intrusion. [Citation.] Nevertheless, the degree of the alleged 'exigency' confronting the officers was likewise insignificant and thus does not overcome the illegality of their action." (*Jacobs* v. *Superior Court, supra,* 36 Cal.App.3d at pp. 496-497.)

Two observations were made by us in *Phelan* v. *Superior Court, supra,* 90 Cal.App.3d at pages 1011-1012 which are helpful in examining the interrelationship between a lawful vantage point by police officers and a defendant's expectation of privacy. First, we found that gaps in a protective barrier did not vitiate an expectation of privacy. Justice Franson stated, "[Par.] The fact that some of the marijuana plants were visible through an opening in the barrier about the garden from a vantage point on the hill above the ravine does not negate petitioners' reasonable expectation of privacy . . . it would be unrealistic to assume that uninvited persons, such as hunters, cattlemen or hikers,

who might find themselves on the hill adjacent to the ravine would be interested in examining the garden with the aid of binoculars to determine the species of the plants growing in the garden." (*Id.*, at pp. 1011-1012.) Second, we indicated that only reasonable efforts to secure privacy "under all of the circumstances" were required on the part of the individuals seeking to insure privacy. (*Id.*, at p. 1012.)

Similarly, in *Burkholder* v. *Superior Court, supra,* 96 Cal.App.3d 421, the court found it impermissible for uninvited government agents to unlock several gates for purposes of viewing a well-enclosed marijuana garden. The court specifically said, "... the marijuana patch was not in plain view and became observable only through a flagrant disregard of well-recognized 'indicia' or 'badges of private ownership' intended to exclude the general public." (*Id.*, at p. 429.)

Moreover, even though the surveillance was validated in *People* v. *Superior Court* (*Spielman*) (1980) 102 Cal.App.3d 342, 347-350 [162 Cal.Rptr. 295], we find the reasoning contained in the concurring opinion helpful in resolving the case before us. *Spielman* involved officers who happened to observe a burglary in the making while on patrol. One of the officers climbed over a fence to "'get to the other side and unlock the gate'" which was latched from the inside. While momentarily balanced on top of the fence, the officer found himself looking into a window and observed Spielman packaging marijuana for sale. (*Id.*, at p. 344.) The evidence conclusively established that the officer's observation was made in good faith and was inadvertent in nature. (*Ibid.*) The majority of the court concluded that the policeman's conduct in inadvertently observing criminal activity through a nearby window was reasonable. (*Id.*, at p. 347.) Although concurring in the result, Justice Grodin made the following pertinent observations: "What is at issue in this proceeding (given the ruling of the trial court) is the lawfulness of the observation which the police officer made from the fence, and not the lawfulness of any subsequent intrusion or seizure. The top of the fence was most certainly not a 'public vantage point' [citation], such as a 'sidewalk, pathway, common entrance or similar passageway ... which necessarily negates any reasonable expectancy of privacy in regard to observations made there.' [Citation.] The trial court was, therefore, quite correct in concluding that real parties had a reasonable expectation of privacy protectible under the Fourth Amendment ....

"The fact (as determined by the trial court) that the police officer was not on top of the fence for the purpose of making any observation

serves to distinguish this situation from cases like *People* v. *Triggs* (1973) 8 Cal.3d 884, 887 ... and *Jacobs* v. *Superior Court* (1973) 36 Cal.App.3d 489, 498 ...." (*People* v. *Superior Court* (*Spielman*), *supra*, 102 Cal.App.3d at pp. 347-348 (conc. opn. of Grodin, J.).) Justice Grodin then noted that the presence of the police officer at the particular vantage point was justified by the exigency of the burglary in process. (*Id.*, at pp. 349-350.)[12]

We are of the opinion that the aforementioned line of cases persuasively demonstrates that Officer Ford viewed the marijuana plants from a vantage point not expected to be used by the public at large. Although the investigating officer was in a public alleyway, the facts undisputably showed that he had to get within one to two inches of the fence before he could take advantage of the gaps and knotholes. Reasoning in the *Phelan, Burkholder* and *Spielman* cases points out that certain types of police surveillance may result in a disregard for private indicia of ownership. As in *Lorenzana* and *Fly*, the officer got within a few inches of an aperture opening in a structure imbued with an expectation of privacy. There was no showing that general members of the public or pedestrians got within an inch or two of the fence in order to gain a glimpse of the backyard area of the residence in which appellant was staying. Furthermore, as was true in *Jacobs* and *Spielman*, no exigency justified the intrusive action of the officer in the present case. The officer did more than merely look over the fence, choosing to engage in the type of invasion condemned by the *Lorenzana* court. Given the fact that the plain view observations here were made from an unlawful vantage point, the present action did not meet the constitutional standard of reasonableness. Thus, when the observations of the marijuana are disregarded, insufficient facts exist in the warrant affidavit to provide probable cause for a search of the backyard of the Maynell Street residence.[13] We therefore conclude that the suppression motion should have been granted.[14]

---

[12]In reaching the conclusion that the top of the fence was not a public vantage point, Justice Grodin relied upon this court's reasoning in the case of *Pate* v. *Municipal Court* (1970) 11 Cal.App.3d 721 [89 Cal.Rptr. 893]. *Pate* involved a trespassing police officer who climbed upon an ornamental trellis to get to a defendant's second-floor motel room and make observations through an accidental aperture in the room's window. We found the activity under such circumstances to constitute an unreasonable governmental intrusion. (*Id.*, at p. 724.)

[13]Without such observations, the affidavit only contains the uncorroborated statements of a confidential, reliable informant.

[14]The People suggest a contrary result, relying upon the case of *Hart* v. *Superior Court* (1971) 21 Cal.App.3d 496 [98 Cal.Rptr. 565]. There, an investigating officer

We have reviewed appellant's other contentions and find them without merit.

The judgment is reversed and the cause remanded to the trial court. That court is directed on motion of appellant within 30 days of the finality of this opinion to vacate the guilty plea and to suppress the observations of Deputy Ford with respect to that which he viewed through the fence around the residence and the testimony resulting from or the evidence seized as the fruit of Ford's activity. Should appellant not so move, or should he duly waive his right to so move, the trial court is directed to reinstate the judgment.

Hopper, Acting P. J., and Lauritzen, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 1, 1981. Richardson, J., was of the opinion that the petition should be granted.

---

went to an adjoining yard and "'looked through a 1/2 inch area separating the wood planks of [a] fence and personally observed thirty [marijuana] plants five to six feet in height'" growing in the petitioner's backyard. He obtained a search warrant based upon this information. The appellate court rejected petitioner's claim of impropriety by stating, "Here, the plants were plainly visible to the neighbor and to the officer whom he invited to his premises to make a similar observation through the fence. Under these circumstances, an expectation of privacy was not reasonable." (*Id.*, at p. 505.) Critical to the result in *Hart* was the fact that the neighbor had initially seen the marijuana plants by looking through the fence and that he merely invited the officer to obtain the same vantage point from his property. (*Id.*, at p. 498.) Contradistinguished from *Hart*, the confidential informant in the present case merely told the officer that the marijuana could be viewed "from the alleyway." Indeed, executing officer Massey said that he could see the plant without having to peer through the fence. Since Officer Ford used a form of surveillance which would not be typically used by a general observer from the alleyway, his observations differ in kind from the surveillance method sustained in *Hart*. Moreover, it is noteworthy that *Hart* was decided before *Lorenzana*, which condemned the type of close-range observations involved in the instant case.

*Assigned by the Chairperson of the Judicial Council.