[Crim. No. 9681. Third Dist. Jan. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN WESLEY BROWN, Defendant and Appellant.

COUNSEL

William J. Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey, J. Robert Jibson and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KARLTON, J.*—Defendant was charged by information with murder (Pen. Code, § 187) and the use of a deadly weapon (a knife) in the commission of the murder. (Pen. Code, § 12022, subd. (b).) Several prior convictions were charged. Defendant pled not guilty and moved to suppress evidence on the ground of unreasonable search and seizure (Pen. Code, § 1538.5). The motion was submitted on the transcript of the preliminary hearing and evidence adduced at a hearing in the superior court. Except for evidence that defendant had possessed a knife, the motion to suppress was denied. Thereupon defendant pled guilty to second degree murder and admitted he used a deadly weapon. He was

---

*Assigned by the Chairperson of the Judicial Council.

sentenced to state prison. Defendant now appeals pursuant to Penal Code section 1538.5, subdivision (m).

Since we have determined that resolution of the issues in this case requires close examination of the facts, we set them out in some detail.

On October 18, 1977, at approximately 11 p.m. the defendant was stopped, identified and searched by a Sacramento police officer on the corner of Sixth and T Streets.[1] At the time, defendant, although male, was dressed in women's clothing and carrying a handbag. The officer observed that he was carrying certain matchbooks, a sharp steak knife (six or seven inches long), and a broken crescent wrench. After a warrant check on defendant proved negative, he was given a certain green card and released. Defendant walked in the direction of nearby Southside Park.

Sometime between 12:15 and 12:45 on the morning of October 19, defendant was seen with an unidentified male in the doorway of the women's restroom in Southside Park.[2] About 8:45 that morning the Sacramento police homicide department was summoned to the scene where a dead male had been found.

The autopsy revealed the victim had been dead from six hours prior to 10 a.m., and it could have been as long as sixteen hours. It also revealed the victim had been stabbed in the neck (the cause of death) and in the rectum. The wounds were made by a knife or knife-like instrument. The coroner opined to police officers that the killing had homosexual overtones by virtue of the stab wound in the rectum and the victim's stretched anal muscles suggesting frequent anal intercourse. The police knew that the restroom area of Southside Park was a place for homosexual contacts.

During the investigation the officers became aware of the official report of the previous stop of defendant. The report contained a full description of the circumstances, including the vicinity and the fact that defendant

---

[1]We do not set out the facts leading to this search inasmuch as it is not attacked in this proceeding.

[2]The record is devoid of testimony as to whether officers who later contacted defendant for the first time after the murder were aware of this particular fact. No officer was asked, nor did any volunteer such information.

was dressed in women's clothing and possessed a knife, which had been returned to him. Upon further investigation, the officers learned that defendant had readmitted himself to Sutter Hospital shortly before noon on October 19, 1977.[3] They also discovered that on readmission two nurses had observed blood on his shoes and stockings.

The officers proceeded to Sutter Hospital for the purpose of talking with defendant and, if possible, taking him to the police station for interrogation. Permission to talk to defendant was obtained from a ward doctor. A nurse on duty informed the officers defendant was in the day room with other patients, but she preferred that they not talk to him in the presence of the other patients. The nurse, after determining that defendant was allowed visiting privileges, escorted him from the day room to "his" room and then motioned the officers into the room. In the room, the officers identified themselves and told the defendant they wished to talk to him about the Southside Park homicide. While in the hospital room, an officer observed a pair of shoes in an open closet with what appeared to him to be a great deal of caked blood on them. Defendant was the only occupant of the room. Thereafter the officers left the hospital with defendant, asking the nurse to secure the room.

On the way to the station, the defendant requested permission to return to his apartment for his purse and a check. Although the officers initially refused the request, upon defendant's entreaty they relented. They accompanied him to his apartment, and when defendant picked up his purse, an officer opened it to check for weapons. He observed blood on the purse and inside a three by five green card similar to the one given to defendant by the officer making the stop the previous night. The purse, and its contents, were seized as evidence.

At the police station, defendant was advised he was under arrest for murder, and of his *Miranda* rights. He declined to answer questions. The defendant was asked for consent to a search of both his apartment and the hospital room. He was told by the officer that if he did not consent there would be no search without a warrant first being obtained. Defendant signed the consent to search form. Although the officer was satisfied that the defendant understood his right to refuse consent to search and that he voluntarily signed the form, the officer nevertheless decided to obtain a search warrant in light of the question of defendant's

---

[3]Defendant had been a psychiatric patient of the hospital from October 12, 1977, to October 18, 1977.

competency to consent raised by his recent psychiatric hospitalization. The search warrant was obtained and pursuant thereto material evidence was obtained.

The defendant makes various attacks upon the trial court's determination, only one of which requires extended discussion.

## I. THE OBSERVATION IN THE HOSPITAL.

Defendant contends here that the observation of the blood-caked shoes in his closet must be suppressed by virtue of the officers not being in a place where they had a legal right to be. It is less than clear that this position was adopted by the defendant at either the preliminary hearing or in the superior court. At the preliminary the defendant asserted through his counsel "[t]he defense is not contending that he [the officer] did not have the right to be in the room." In the superior court, counsel took the position that the question presented to the court was whether the observation of the shoes was "the result of a plain view sighting." It is not clear that the latter issue was based upon the claimed lack of the officer's right to be in the hospital room. (See *People* v. *Pranke* (1970) 12 Cal.App.3d 935 [91 Cal.Rptr. 129].) Nonetheless, since as we shall point out, *infra,* a "plain view sighting," can only be based upon an observation made from a place where the officers have a right to be, we believe it appropriate to examine the merits. We conclude that under the peculiar facts of this case, the officers had a right to be in the hospital room.

The Fourth Amendment to the United States Constitution, and its California counterpart (art. I, § 13), embody a variety of values, primary among which is the protection of privacy. (*Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].) In furtherance of this constitutional value, our Supreme court has taught that seeing something in plain sight from a place where an officer has a right to be is not a ". . . search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement." (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33].)

Since this case turns on the question of whether under the circumstances defendant had an expectation of privacy, not surprisingly, defendant asserts a hospital room is *always* cloaked with such expectation and the People argue that it *never* is.

As this court has previously noted, a refined analysis of the hospital setting is required—one that acknowledges both private and public areas. "Many areas of a hospital are public places and as such are not areas subject to constitutional protection from entry without warrant for either arrest or search and seizure. [Citations.] The public hallway where the officers waited was clearly such an area. There can, of course, be private areas within public places . . . offered to the public for private, although transient, individual use [citation], where general or routine clandestine observation to detect criminal acts is both an unlawful search and an invasion of the constitutional right of privacy." (*People* v. *Schad* (1971) 21 Cal.App.3d 201, 209 [98 Cal.Rptr. 439].) The question this case asks is whether a hospital room is "public," "private" or something in between.

■ The test for determining whether a given area is cloaked with the occupant's expectation of privacy is not the occupant's mere subjective, unmanifested expectation (*Dean* v. *Superior Court* (1973) 35 Cal.App.3d 112, 117 [110 Cal.Rptr. 585]), but an objective test drawn from the circumstances. Thus, our Supreme Court has taught, "Taking into account the nature of the area surrounding a private residence, we ask whether that area has been opened to public use; if so, the occupant cannot claim he expected privacy from all observations of the officer who stands upon that ground; if not, the occupant does deserve that privacy." (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 638.)

Moreover, the question of privacy in a hospital does not merely turn on a general expectation of privacy in use of a given space, but to some degree depends on the person whose conduct is questioned. Clearly, although by checking himself into a hospital, a patient may well waive his right of privacy as to hospital personnel, it is obvious that he has not turned "his" room into a public thoroughfare. Indeed, the classic example of tortious invasions of privacy involves a hospital room.[4]

A hospital is, in a sense, *sui generis.* It is unlike a motel room for instance, which is rented with the implicit right to keep all others out. The patient knows and expects that nurses, doctors, food handlers, and others enter and leave "his" hospital room in accordance with the medical needs of the patient and the hospital routine. On the other hand, a hospital room is clearly not a public hall which anyone in the building is free to

---

[4]The example utilized in Restatement Second of Torts section 652B, "Intrusion Upon Seclusion," is one example: "A, a woman, is sick in a hospital with a rare disease that arouses public curiosity. B, a newspaper reporter, calls her on the telephone and asks for an interview, but she refuses to see him. B then goes to the hospital, enters A's room and over her objection takes her photograph. B has invaded A's privacy."

use as needed. Thus, at least for certain purposes, a hospital room is fully under the control of the medical staff; yet for other purposes it is "the patient's room." For this reason, it is not inappropriate to view a hospital room as one within joint dominion, at least for certain purposes.[5]

The ambiguity as to the room's status for privacy purposes is particularly acute in this case, since it appears that it was a ward nurse who led the defendant back to "his" room, and in essence permitted the officer initially to enter it.

 Resolution of the issue presented requires critical examination of the circumstances of the police visit, and an attempt to discriminate between cases in which the privacy right to the room is reserved to the patient and where it may be said that a nurse is justified in permitting entry.[6] Here the evidence supports the finding that the officers were not in the hospital room to search it.[7] Rather they were there to take the defendant downtown to talk to him about the murder.

 The notion that a nurse can authorize a visitor's entrance (albeit on official business) seems not only to accord with the everyday practice of hospitals (the nurse characterized her conduct relative to this incident as "routine") but with everyday expectations of hospital patients.[8] That is not to say that the patient may not refuse to see the visitor, indeed it seems clear that he could do so. In California, at least for tort purposes, the patient's right to exclusive occupancy against, for instance, private investigators has been implicitly recognized. (*Noble v. Sears Roebuck & Co.* (1973) 33 Cal.App.3d 654 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164].) Here, the defendant did not refuse to see the officers. (*People v. Meneley* (1972) 29 Cal.App.3d 41 [105 Cal.Rptr. 432].) On the

[5]Thus a nurse could not consent to the photographer taking the photo in the room discussed in footnote 4 above as clearly as she could permit a technician to enter to X-ray the patient. (By happenstance, perhaps the first case explicitly recognizing a tortious invasion of privacy involved medical personnel abuse of their authority by permitting invasion of a sick room. (*DeMay v. Roberts* (1881) 46 Mich. 160 [9 N.W. 146].))

[6]It is also critical to understand what this case is not about. This case does not consider unrelated issues which might be occasioned by other facts, such as the closet door being closed.

[7]Moreover, even if the evidence were not as clear as it in fact is, such a finding is clearly implied by the trial court's upholding of the search. (*People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

[8]Of course an everyday unconstitutional practice would not legitimate otherwise illegal conduct; however, as this court has observed ". . . mankind's common habits in the use of domestic and business property supply a prime measure of the reasonableness of expectations of privacy." (*Dean v. Superior Court, supra,* 35 Cal.App.3d at p. 117.)

contrary, apparently after the nurse told the defendant the officers were there to see him, he accompanied her to his room to meet them.

■ We wish again to stress the narrowness of this holding. We merely hold that no Fourth Amendment violation occurs when a nurse permits an officer to enter a sentient patient's hospital room for purposes unrelated to a search, the patient does not object to the visit, and the officer then sees evidence in plain sight.

■ Defendant's further contentions do not require extended discussion. He asserts that he was unlawfully arrested at the hospital due to a lack of probable cause. The facts known to the officers at the time of the arrest were that a male person had been murdered in the women's restroom at Southside Park sometime during the night of October 18 or morning of October 19. The victim had been stabbed, and the killing had homosexual overtones. Defendant, dressed in women's clothing, had been stopped by the police in an area near Southside Park about 11 p.m. on October 18, and was in possession of a knife.[9] Defendant was seen around 12:30 a.m. on October 19 with a white male, a known homosexual contact, at the restroom.[10] Defendant checked into the hospital on October 19 with blood on his shoes and stockings. The officers saw the blood on the shoes at the hospital. Such facts would lead a man of ordinary care and prudence to believe and conscientiously to entertain an honest and strong suspicion that defendant was guilty of a crime. (*People v. Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961]; *People v. Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].)[11]

■ Defendant next contends that the seizure by the officer of the contents of his purse was unlawful. In addition to the argument which

[9]The defendant argues that we must disregard the fact that he was armed with a knife since evidence of it was later excluded by the trial court. We are not required to disregard the knife for purposes of determining probable cause to arrest since the reasonableness of an officer's conduct is determined on the basis of information possessed by him at the time he acts. (*People* v. *Gale* (1973) 9 Cal.3d 788, 795 [108 Cal.Rptr. 852, 511 P.2d 1204]; *People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].)

[10]The officers may or may not have been aware of the fact a witness had observed defendant at the restroom (see fn. 2, *ante.*)

[11]At oral argument, defendant's attorney stressed that the officer had no subjective belief relative to the defendant's guilt when he went to the hospital. From this he suggests the hospital arrest was invalid. (*Agar* v. *Superior Court* (1971) 21 Cal.App.3d 24, 29 [98 Cal.Rptr. 148]; *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205].) Our reading of the record however is that the officer went to the hospital to talk to defendant without any belief, but when he saw the bloody shoes he immediately formed such a belief and the arrest was made.

arises out of his assertions concerning the entry of his hospital room, which now must necessarily fail, he argues that the seizure of the purse at the apartment was unlawful. We again point out that the officers were not in the apartment as a pretext to conduct a search, indeed, initially the officers refused to permit the defendant to go to his apartment for the purpose of obtaining his purse. When they acceded to his request the officers accompanied him to the apartment because they did not want defendant to get away or "grab a weapon or try to do anything foolish." When the defendant picked up his purse the officer took it from him for the purpose of looking for a weapon. Such conduct was lawful. (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 529 [119 Cal.Rptr. 315, 531 P.2d 1099].) The defendant argues that such a search may only be made immediately incidental to an arrest and thus at the actual time of the arrest. Such an argument is a non sequitur. At the time of the arrest the defendant had no purse, it being acquired on the trip downtown. As to the seizure of the purse itself, the officer observed the blood on it, and accordingly it was in plain view. In any event, once the purse was in defendant's possession it would have been subject to a "booking search." (*People* v. *Rogers* (1966) 241 Cal.App.2d 384 [50 Cal.Rptr. 559].)

Defendant argues that his formal arrest at the police station was unlawful for lack of probable cause. Since we have held that the defendant was actually arrested at the hospital with probable cause, the issue is of no moment.

Defendant argues his consent to the search was the product of unlawful official conduct. Because the officer obtained a search warrant and did not rely on the consent, it would appear that the consent is of no moment.

Defendant argues various asserted flaws in the affidavit. First, he argues that the warrant was invalid because a substantial part of the affidavit was based upon the evidence found as the result of the unlawful official conduct. Since the conduct was not unlawful the affidavit was not infirm in this regard.

Defendant's argument that the affidavit otherwise does not state sufficient probable cause for issuance of a warrant is also rejected. He seeks to attack the warrant by noting that included within the warrant was the fact of the knife, which was subsequently suppressed. From this he argues that it should be excised, and upon excision there is insufficient evidence connecting the defendant with the crime. Yet even with an excision of the knife, there is sufficient relevant evidence that would lead

a magistrate as a reasonable man to believe and conscientiously entertain a strong suspicion that there is property subject to seizure in the place for which the warrant is sought. (*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *Superior Court (Brown)* (1975) 49 Cal.App.3d 160, 165 [122 Cal.Rptr. 459].) ■ The other asserted deficiencies in the warrant are mere technicalities, and the court is required to read the affidavit in a nontechnical commonsense manner. (*People* v. *Superior Court (Johnson)* (1972) 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183]; *People* v. *Superior Court (Brown), supra,* 49 Cal.App.3d at p. 165.)

The judgment is affirmed.

Puglia, P. J., and Paras, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 14, 1979.