Opinion
GRODIN, J.
This case requires us to examine the contours of California citizens’ entitlement to be free from the intrusive gaze of the state, in an era when the instruments of surveillance at the disposal of the police are far more sophisticated than our nation’s founders would have dared contemplate. Here, after law enforcement officials were frustrated in their effort to confirm from any land-based public vantage point an anonymous tip of possible marijuana cultivation at appellant’s residence, they carefully surveyed appellant’s fenced back yard from a fixed-wing aircraft without obtaining a warrant, We conclude that this warrantless scrutiny, which led to the acquisition of a search warrant under which marijuana growing in ap *376 pellant’s yard ultimately was seized, violated appellant’s rights under article I, section 13 of the California Constitution.[1]
The issue is whether appellant enjoyed a so-called reasonable expectation that he could conduct affairs in his enclosed back yard in privacy. (People v. Crowson (1983) 33 Cal.3d 623, 629 [190 Cal.Rptr. 165, 660 P.2d 389]; Burrows v. Superior Court, supra, 13 Cal.3d 238, 242-243; see Katz v. United States (1967) 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-582, 88 S.Ct. 507].) As employed in this context the term “reasonable expectation” possesses two meanings, one predictive, the other prescriptive. With respect to the first of these, the People concede appellant anticipated that what took place in his backyard would remain secluded from the view of outsiders. Thus the principal focus of our inquiry is whether, as an objective matter, appellant should have been entitled to demand the privacy he sought—even from airborne, arguably quite physically unobtrusive, observation by law enforcement officials.
The reasonable expectation of privacy test, by its nature, requires reconciliation of competing social interests, rather than rigid application of formalistic, judicially created rules. This is all the more true here, where the alleged challenge to individual security comes from a rather novel form of police investigation subject to little analysis in reported cases. Still, there is relevant precedent. The United States Supreme Court recently reaffirmed that, as with the home itself, those activities taking place within the dwelling’s curtilage—“the area to which extends the intimate activity associated with the ‘sanctity of a man’s home and the privacies of life’ [citations omit *377 ted]” (Oliver v. United States, supra, 466 U.S. 170, 180 [80 L.Ed.2d 214, 225])—may reasonably be expected to remain private. (Ibid.) An enclosed back yard whose outer boundary was within yards of appellant’s dwelling clearly satisfies this definition.
The People, however, point out that even with respect to those activities which occur in one’s living room, one is not entitled to demand privacy from peering officers of the state if the activities are plainly visible to officers rightfully occupying a lawful public vantage point, or if an established exception to the warrant requirement is applicable. Given that the airspace occupied by the police here is a lawful public location, the People argue, the police observation of appellant’s back yard is well within the plain view doctrine, and therefore no constitutional violation.
This contention holds superficial appeal, but, in the end, it must prove unavailing. While the skies are accessible to the public—and even though private air traffic may regularly wing over one’s property—simply because one may have to put up with the occasional downward glance of a passing pilot or passenger does not abrogate the force of one’s demand that police officers, acting as part of an investigation but without a warrant, refrain from examining from the air the details of one’s back yard. (Cf., for example, People v. Krivda (1971) 5 Cal.3d 357, 367 [96 Cal.Rptr. 62, 486 P.2d 1262], vacated and remanded (1972) 409 U.S. 33 [34 L.Ed.2d 45, 93 S.Ct. 32], reiterated (1973) 8 Cal.3d 623 [105 Cal.Rptr. 21, 504 P.2d 457].) A society where individuals are required to erect opaque cocoons within which to carry on any affairs they wish to conduct in private, and the concomitant chill such a requirement would place on lawful outdoor activity, would be inimical to the vision of legitimate privacy which underlies our state Constitution.
Facts
On September 2, 1981, an anonymous citizen gave local narcotics officers information suggesting marijuana was being cultivated at appellant’s residence in Bonsall, a town in northern San Diego County. An officer went to the property, located in a semirural area,[2] but was unable to verify the tip, because a high wooden fence surrounded appellant’s land. There was no other location accessible to the public from which to make further observations. Undeterred, the officer returned two days later in an airplane piloted by a fellow member of the San Diego Narcotics Task Force. The two flew over the property at an altitude of roughly 1,600 feet, hoping to spot evidence of the alleged growth of the marijuana. Their labors were reward *378 ed when they saw what they believed to be marijuana plants growing in an enclosed area behind appellant’s house. Their belief was based on the “lush green” color of the plants, which contrasted with the less vivid pigmentation of the surrounding lawn and trees, and the fact the suspicious vegetation was growing in uniformly spaced rows.
One of the officers took color photographs of the plants with a 200 millimeter lens (which magnifies the subject of a photograph taken with a standard 35-millimeter camera by about 4 times), and the pair returned to police headquarters. One of them executed an affidavit in support of a search warrant, and a warrant was issued, though the photographs were dim and failed to reveal the purportedly striking difference in color between the alleged marijuana and the surrounding plants. A search conducted pursuant to the warrant disclosed that marijuana indeed was growing behind appellant’s residence. The area in which it was found was surrounded on three sides by an eight-foot-high solid wood fence. The house itself provided a barrier on the fourth side. The fence was covered at the top with wood beams and chicken wire. Surrounding the house, as well as this enclosure, was a six-foot-high fence.
Appellant was charged with unlawfully cultivating marijuana, in violation of Health and Safety Code section 11358. He moved to suppress the evidence of his commission of this offense, contending that the warrant pursuant to which the marijuana was discovered was itself obtained as a result of an unlawful search, and therefore invalid, rendering the search in which the evidence was found unlawful. The trial court ruled that the overflight did not constitute a search because any expectation of privacy appellant may have had in his backyard was unreasonable, and it denied appellant’s motion. Appellant entered a negotiated plea of guilty, and he now appeals the denial of his suppression motion.
Discussion
Determining the legality of warrantless police forays into allegedly private zones of activity was once almost exclusively a matter of ascertaining the scope of the property interests of the individual whose privacy was purportedly invaded. (See Goldman v. United States (1942) 316 U.S. 129, 134-136 [86 L.Ed. 1322, 1327-1328, 62 S.Ct. 993]; see also People v. Edwards (1969) 71 Cal.2d 1096, 1102-1107 [80 Cal.Rptr. 633, 458 P.2d 713], citing People v. Shields (1965) 232 Cal.App.2d 716, 719 [43 Cal.Rptr. 188]; People v. Willard (1965) 238 Cal.App.2d 292 [47 Cal.Rptr. 734]; People v. Johnson (1962) 198 Cal.App.2d 698, 701, 702 [18 Cal.Rptr. 214].) However, in 1967, Katz v. United States, supra, 389 U.S. 347, affirmed *379 that constitutional limitations on police searches and seizures protect “people, not places.” (P. 351 [19 L.Ed.2d at p. 582].)
Under the Katz standard as applied in California, the propriety of a warrantless governmental surveillance has come to encompass an assessment of the reasonableness of the individual’s expectation of privacy in a particular situation, wherever he is, and whether or not government agents trespassed physically on his property interests. (E.g., Lorenzana v. Superior Court (1973) 9 Cal.3d 626, 638 [108 Cal.Rptr. 585, 511 P.2d 33]; People v. Edwards, supra, 71 Cal.2d 1096, 1103.) The inquiry is whether the government intruded unreasonably on an expectation of privacy which society is prepared to recognize as valid. (People v. Chapman (1984) 36 Cal.3d 98, 106 [201 Cal.Rptr. 628, 679 P.2d 62].)
Though location is no longer the sine qua non of search-and-seizure analysis, it remains relevant under the Katz test. The privacy one is entitled to expect in a particular place is governed primarily by common habits in the use of such property. (E.g., In re Deborah C. (1981) 30 Cal.3d 125, 137 [177 Cal.Rptr. 852, 635 P.2d 446]; see North v. Superior Court (1972) 8 Cal.3d 301, 311 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; Dean v. Superior Court (1973) 35 Cal.App.3d 112, 117 [110 Cal.Rptr. 585].)
Thus, we guard with particular zeal an individual’s right to carry on private activities within the interior of a home or office, free from unreasonable governmental intrusion. (E.g., Vale v. Louisiana (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; People v. Ramey (1976) 16 Cal.3d 263, 270-276 [127 Cal.Rptr. 629, 545 P.2d 1333]; People v. Dumas (1973) 9 Cal.3d 871, 882, fn. 8 [109 Cal.Rptr. 304, 512 P.2d 1208].) We also recognize a high privacy interest in the “curtilage” of a residence— that zone immediately surrounding the home where its private interior life can be expected to extend. (People v. Edwards, supra, 71 Cal.2d 1096, 1101, fn. 2, 1104.) For example, a government agent without a warrant may not peer through barriers reasonably calculated to shield one’s yard from public view, even if the officer is standing in a “public” place. (People v. Lovelace (1981) 116 Cal.App.3d 541, 554 [172 Cal.Rptr. 65]; People v. Fly (1973) 34 Cal.App.3d 665, 667 [110 Cal.Rptr. 158]; Vidaurri v. Superior Court (1970) 13 Cal.App.3d 550, 553-554 [91 Cal.Rptr. 704].)
The United States Supreme Court recently confirmed this constitutional respect for privacy in the curtilage. In Oliver v. United States, supra, 466 U.S. 170 [80 L.Ed.2d 214], the court reembraced the longstanding federal rule that “open fields” may be inspected by law enforcement officers without a warrant. The Oliver majority reasoned that uninhabited fields and *380 woodlands are not among the “persons, houses, papers, and effects” protected by the Fourth Amendment, and the uses to which such areas are usually put give rise to no reasonable expectation of privacy from public view. (460 U.S. at pp. 175-185 [80 L.Ed.2d at p. 222-228]; see Hester v. United States (1924) 265 U.S. 57, 59 [68 L.Ed. 898, 900, 44 S.Ct. 445].)
However, Oliver carefully emphasized that the curtilage—that area “immediately surrounding and associated with the home”—remains within the Fourth Amendment’s protection. This zone, the majority explained, “is the area to which extends the intimate activity associated with the ‘sanctity of a man’s home and the privacies of life’ [citations], and therefore has been considered part of [the] home itself for Fourth Amendment purposes. ...” (466 U.S. at p. 180 [80 L.Ed.2d at p. 225].)
The People concede that the home and curtilage enjoy substantial protection from warrantless searches. However, they invoke the doctrine that an officer does not “search” in the constitutional sense when he observes, even intensively, that which lies in “plain view” from a vantage point open to the public. (E.g., In re Deborah C., supra, 30 Cal.3d 125, 135; Lorenzana v. Superior Court, supra, 9 Cal.3d 626, 634; see Katz v. United States, supra, 389 U.S. 347, 351-353 [19 L.Ed.2d 576, 584].) Despite the fence which hid defendant’s backyard from ground-level observation, they emphasize, the yard was open to routine observation from any private, commercial, or government flight across the airspace above his property. Moreover, they point out, the surveillance here was not unduly intrusive, since it took place from a height of some 1,600 feet. (Cf. People v. Sneed (1973) 32 Cal.App.3d 535, 542-543 [108 Cal.Rptr. 146].) Defendant had no “reasonable” expectation, they suggest, that his marijuana plants could be concealed from “plane view.”
We disagree. As the United States Supreme Court and the courts of this state have often explained, the fact that government officials or members of the civilian public might be expected, for one reason or another, to enter a place or see or hear the activities within, does not necessarily preclude reasonable claims of privacy from intensive spying by police officers looking for evidence of crime.
Thus, one who places a call from a public telephone booth can be seen and sometimes heard by passersby, but that does not permit the government to eavesdrop electronically on the conversation without a search warrant. (Katz, supra, 389 U.S. 347, 352 [19 L.Ed.2d 576, 582].) A hotel guest may realize that the maid will enter his room, but that provides no basis for warrantless entry by the police. (Stoner v. California (1964) 376 U.S. 483, 489 [11 L.Ed.2d 856, 860, 84 S.Ct. 889].) One may consign the refuse in *381 his trash can to casual inspection by garbage collectors, children, and tramps, but that gives the police lacking a warrant no license to examine the articles in the can. (People v. Krivda, supra, 5 Cal.3d 357, 367.) The fact that persons using a public restroom may see activities within its door-less stalls does not allow police agents to spy on those activities systematically from a secret vantage point inaccessible to the public. (People v. Triggs (1973) 8 Cal.3d 884, 891-892 [106 Cal.Rptr. 408, 506 P.2d 232].) And the police may not intrude into a hospital room simply because hospital personnel routinely go in and out. (People v. Brown (1979) 88 Cal.App.3d 283, 289-292 [151 Cal.Rptr. 749].)
Thus, while an inhabitant of the modern world is deemed to “expect . . . the expectable,” the Constitution still shields him from governmental intrusions he has legitimate grounds not to expect. (In re Deborah C., supra, 30 Cal.3d 125, 138-139, fn. 10.) One’s yard may unavoidably be exposed to casual glances from passing aircraft, but he may still reasonably assume that it will not be intently examined by government agents who are flying over it for that specific purpose.[3]
The People suggest that the air lanes are modern highways; hence, they urge, aerial surveillance, if not unduly intrusive, is but a form of routine “street patrol,” to which the modern public must be deemed to be resigned. For several reasons, we cannot accept that view.
In the first place, we recognize that the Katz test depends in part on the individual’s “subjective” expectation of privacy. His desire for seclusion may be demonstrated by the steps he has taken to prevent observation. An occupier of land can usually take fairly routine action to shield his house and yard from ground-level scrutiny, and defendant certainly did so here.
*382 On the other hand, the Constitution does not provide that one is open to governmental inspection by any and all means he has failed to forestall. (In re Deborah C., supra, 30 Cal.3d 125, 138-139, fn. 10; Lorenzana v. Superior Court, supra, 9 Cal.3d 626, 636-637; see also 1 LaFave, Search and Seizure (1978) § 2.3, p. 303; Amsterdam, Perspectives on the Fourth Amendment (1974) 58 Minn.L.Rev. 349, 402.) Such a rule would encourage the transformation of our open society into a garrison state, each individual obsessed with shielding private activities in presumptively private areas from all possible observation.
That task is virtually impossible, of course, where sophisticated techniques like electronic eavesdropping and aerial surveillance are involved. Purposeful surveillance from the air simply lays open everything and everyone below—whether marijuana plants, nude sunbathers, or family members relaxing in their lawn chairs—to minute inspection. The usual steps one might take to protect his privacy are useless. To obtain relief from the airborne intrusion, one would have to roof his yard. Besides the considerable monetary expense, he would sustain the greater intangible cost of shutting out the sunlight and fresh air which gives such a space its precious character. Surely one has reason to expect that he need not “encase himself [and his property] in a light-tight, air-proof box.” (Lorenzana, supra, 9 Cal.3d at p. 637.)
In any event, as numerous cases restricting use of electronic and optical surveillance aids attest, the “reasonableless” of an individual’s expectation of privacy is not defined solely by technological progress. We reject the Orwellian notion that precious liberties derived from the Framers simply shrink as the government acquires new means of infringing upon them.
The People imply that law enforcement officers are entitled to use a technological advance—mechanical flight—which has merely given the public at large a vantage point it did not previously enjoy. But the prevalance of air travel does not excuse us from the delicate balancing of societal and privacy interests which underlie constitutional protections against “unreasonable!’ searches and seizures. Striking that balance, we must conclude that an individual has a reasonable expectation of privacy from purposeful police surveillance of his back yard from the air. We can conceive of no societal or law enforcement interest strong enough to justify such unfettered intrusions on the sanctity of private residences.[4]
*383 The California cases on aerial surveillance are in general accord. They have recognized that “[Reasonable expectations of privacy may ascend into the airspace and claim [constitutional] protection.” (See People v. Joubert (1981) 118 Cal.App.3d 637, 643 [173 Cal.Rptr. 428], quoting Dean v. Superior Court, supra, 35 Cal.App.3d 112, 116.) As one Court of Appeal has noted, “mankind’s common habits in the use of domestic and business property supply a prime measure of the reasonableness of expectations of privacy. [Citations.] One who builds a swimming pool and sun-bathing area in his back yard expects privacy (hence immunity) from aerial inspection. ...” (Dean, supra, 35 Cal.App.3d at p. 117, quoted in Joubert, supra.)
Consistent with the traditional distinction between “open fields” on the one hand, and house and curtilage on the other, most California cases have approved surveillance conducted at substantial heights over rural land. With two exceptions, these decisions involved no intensive scrutiny of private yards, and several opinions emphasized the uninhabited nature of the area inspected. (People v. Egan (1983) 141 Cal.App.3d 798, 806 [190 Cal.Rptr. 546] [“lawful altitudes over rural and relatively unpopulated property”]; Tuttle v. Superior Court (1981) 120 Cal.App.3d 320, 325 [174 Cal.Rptr. 576] [flight no lower than 1,000 feet; “tents, ‘other structures,’ vehicles and people . . . observed” at marijuana cultivation site]; Joubert, supra, 118 Cal.App.3d at pp. 640-641 [rural 29-acre parcel; location of house noted for purposes of confirming parcel ownership and address]; People v. St. Amour (1980) 104 Cal.App.3d 886, 890 [163 Cal.Rptr. 187] [mountain slope; “deserted area;” no business or human activity observable from the air]; Burkholder v. Superior Court (1979) 96 Cal.App.3d 421, 424 [158 Cal.Rptr. 86] [steep canyon surrounded by trees in rural area]; Dean, supra, 35 Cal.App.3d at p. 114 [“isolated area of the Sierra foothills, . . . hidden from view by the surrounding hills and woods”].)
On the other hand, People v. Sneed, supra, 32 Cal.App.3d 535, suggested that one has “no reasonable expectation of privacy . . . from airplanes and helicopters flying at legal and reasonable heights.” However, the court invalidated as unduly intrusive an observation from a helicopter hovering 20 to 25 feet above defendant’s back yard. (P. 543.)
Finally, in People v. Superior Court (Stroud) (1974) 37 Cal.App.3d 836 [112 Cal.Rptr. 764], the Court of Appeal upheld aerial observations of a *384 backyard by a police helicopter flying at 500 feet. The helicopter, on normal patrol, had been summoned to aid in a car-stripping investigation. During a general surveillance of the surrounding neighborhood, its pilot noticed an automobile hood lying in Stroud’s yard. The court stressed the routine nature of police helicopter surveillance in the Los Angeles area “for the safety and protection of the inhabitants and their property.” It was not reasonable to expect, the court said, that “[a]n article as conspicuous and readily identifiable as an automobile hood can be regarded as hidden from such a view. ” Sneed was distinguished by the difference in the height at which the flight over Stroud’s property was conducted. (Pp. 838-839.)
The People seize on such cases as Sneed and Stroud for the principle that aerial surveillance of a private yard is permissible if conducted at a height which is not disruptive to life below. Indeed, they urge, at 1,600 feet it is virtually impossible to observe legitimate and private human activities on the ground. The only possible purpose and effect of an overflight at that altitude, they suggest, is to detect marijuana cultivation.
Obviously, as the People point out, one has no “reasonable” expectation of privacy in the conduct of criminal affairs per se. (See, e.g., Oliver v. United States, supra, 466 U.S. 170, 182, and fn. 13 [80 L.Ed.2d 214, 226-227]; Dean v. Superior Court, supra, 35 Cal.App.3d 112, 117.) Hence, there is theoretical appeal to the notion that warrantless surveillance is not an unreasonable “search” if it is narrowly tailored to discover crime while leaving all legitimate private activity undisturbed.
However, a recent United States Supreme Court case illustrates the fallacy of that approach to these facts. In United States v. Karo, supra, 468 U.S. 705 [82 L.Ed.2d 530], federal agents placed a “beeper” in a can of ether sold to suspected drug manufacturers. The agents could track the location of the can by monitoring the radio signals from the beeper. (See United States v. Knotts (1983) 460 U.S. 276, 277 [75 L.Ed.2d 55, 59, 103 S.Ct. 1081].) They later obtained a search warrant for a Taos, New Mexico residence, in part on grounds that beeper signals from within the house indicated the can was there. The district court suppressed the evidence yielded by the warrant; the court of appeals affirmed.
The government argued that monitoring of the beeper within the house was permissible because it could only disclose the location of illegal drug ingredients, exposing nothing else about the activities inside. The Supreme Court rejected this contention. It reiterated that the police may learn by electronic means what legitimate personal surveillance would have disclosed. (468 U.S. at pp. 712-713 [82 L.Ed.2d at p. 540]; see Knotts, supra, 460 U.S. at pp. 281-282 [75 L.Ed.2d at pp. 61-63].) However, the court *385 declared, government agents may not use such devices to intrude where they themselves have no right to be.
“The monitoring of an electronic device such as a beeper,” said the majority, “is, of course, less intrusive than a full-scale search, but it does reveal a critical fact about the interior of the [residence] that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant. ...[!] We cannot accept the Government’s contention that it should be completely free of the constraints of the [Constitution] to determine by means of an electronic device . . . whether a particular article ... is in an individual’s home at a particular time. Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of [constitutional] oversight. [Fn. omitted.]” (468 U.S. at pp. 715-716 [82 L.Ed.2d at pp. 541-542], italics added.)
We entirely agree. What Karo has said about the interior of houses applies equally, of course, to the immediately adjacent exterior, “which has been considered part of the home itself” for constitutional purposes. (Oliver, supra, 466 U.S. at p. — [80 L.Ed.2d 214, 225].) The surveillance at issue in this case was conducted without “oversight,” and any “constraints” on its intrusiveness were subjective and self-imposed. Moreover, the current record discloses no basis on which guidelines for “oversight” of marijuana surveillance of private yards could be fashioned.[5]
We hold, therefore, that the warrantless aerial scrutiny of defendant’s yard, for the purpose of detecting criminal activity by the occupants of the property, was forbidden by article I, section 13 of the California Constitution.[6] Any inconsistent language in such cases as Sneed and Stroud, both supra, is disapproved.
*386 The warrant authorizing a search of defendant’s premises for marijuana plants, and for the seizure of any plants discovered, was obtained solely on the basis of the aerial observations. The seized evidence should therefore have been excluded from defendant’s trial. Since the error was clearly prejudicial, his conviction must be overturned. Our analysis makes it unnecessary to consider defendant’s other arguments.
The judgment is reversed.
Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., and Kaus, J.,* concurred.

 Article I, section 13 provides: “The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized.”
We do not imply that warrantless aerial surveillance of an enclosed back yard is permissible under the Fourth Amendment to the United States Constitution. Indeed, there are strong indications that the practice would be deemed unconstitutional by the United States Supreme Court. (Cf., United States v. Karo (1984) 468 U.S. 705 [82 L.Ed.2d 530, 542, 104 S.Ct. 3296]; Oliver v. United States (1984) 466 U.S. 170, 181-182, and fn. 12, but see p. 179, and fn. 9 [80 L.Ed.2d 214, 225-226, 104 S.Ct. 1735].) The Supreme Court has granted certiorari and has recently heard argument in a case presenting the backyard surveillance issue. (People v. Ciraolo (1984) 161 Cal.App.3d 1081 [208 Cal.Rptr. 93], cert, granted (1985) 471 U.S. 1134 [86 L.Ed.2d 691, 105 S.Ct. 2672] [argued with Dow Chemical Co. v. United States (6th Cir. (1984) 749 F.2d 307, cert, granted (1985) 472 U.S. 1007 [86 L.Ed.2d 716, 105 S.Ct. 2700]].) However, while we rely on federal precedent for guidance (see, e.g., Burrows v. Superior Court (1974) 13 Cal.3d 238, 242-243 [118 Cal.Rptr. 166, 529 P.2d 590]), we need not address the precise reach of the Fourth Amendment unless persuaded that our state charter provides no protection against the state’s surveillance here.
Moreover, since all events at issue here took place before June 8, 1982, we need not be concerned with the effect of Proposition 8 on the excludability of evidence obtained in violation of article I, section 13. (People v. Smith (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

There are approximately 15 houses within 1,000 feet of appellant’s property.

We recognize that substantial tension and confusion surround the “plain view” doctrine. Some cases hold that an officer may watch or examine with his naked eyes and ears from any place he has a right to be, or from any vantage point or passageway open to the public. (E.g., In re Deborah C., supra, 30 Cal.3d 125, 134-135 [spying by store security guard from “common passageway” into fitting room]; Lorenzana v. Superior Court, supra, 9 Cal.3d 626, 629, 635-636 [officer’s unaided observation from public access route on property would not violate reasonable privacy expectations]; People v. Bradley (1969) 1 Cal.3d 80, 85 [81 Cal.Rptr. 457, 460 P.2d 129] [police inspection of marijuana growing 20 feet from defendant’s back door, “to which presumably delivery men and others came”].) Others, such as Triggs, Krivda, Stoner, and Brown, all supra, suggest that one may expect some casual public observation without necessarily consenting to police surveillance. As Deborah C. noted, however, the degree and kind of privacy one has a right to expect in a particular place depends to a large extent on common habits in the use of property of that sort. (30 Cal.3d at p. 137, also cf. pp. 138-139, fn. 10; see also Oliver v. United States, supra, 466 U.S. 170, 179 [80 L.Ed.2d 214, 224-225].) Common habits certainly give rise to a reasonable expectation that, absent warrant or exigency, a private yard will not be spied upon from the air by police officers scrutinizing the property for evidence of crime.

We realize the majority opinion in Oliver v. United States, supra, appears to assume that “the public and police lawfully may survey lands from the air.” (466 U.S. 170, 179 [80 L.Ed.2d 214, 224].) This proposition, of course, does not bind our construction of the California Constitution; our own cases, as noted, have recognized a distinction between “public” and “police” observation. In any event, Oliver sharply distinguishes privacy pro *383 lection due a home and curtilage from that accorded in the “open fields” there at issue. Nothing in Oliver suggests the United States Supreme Court would approve intense aerial scrutiny of an enclosed back yard. Indeed, the two cases cited by the Oliver majority to support its aerial surveillance comment both involved observation of farms. In neither instance was there any allegation that the homestead or any area properly viewed as within the curtilage were surveyed by police aircraft. (United States v. Allen (9th Cir. 1980) 675 F.2d 1373, 1377; United States v. DeBacker (W.D.Mich. 1980) 493 F.Supp. 1078, 1079 [5 A.L.R. Fed. 765].)

Cases permitting the use of trained dogs to “sniff” airport luggage for marijuana (United States v. Place (1983) 462 U.S. 696, 707 [77 L.Ed.2d 110, 120-121, 103 S.Ct. 2637]; People v. Mayberry (1982) 31 Cal.3d 335, 341-342 [182 Cal.Rptr. 617, 644 P.2d 810]) do suggest that techniques which disclose only evidence of crime may not be “searches.” Nonetheless, those decisions are easily distinguishable. “[PJrivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable. . . .” (Karo, supra, 468 U.S. at p. 705 [82 L.Ed.2d at p. 541], italics added.) On the other hand, persons carrying luggage in a public airport have no reason to expect that odors emanating into the surrounding public airspace will go unnoticed by the authorities. (Place, supra, 462 U.S. at p. 707 [77 L.Ed.2d at p. 121]; Mayberry, supra, 31 Cal.3d at p. 341.)

The police here employed a telephoto lens to take the pictures presented in support of issuance of a warrant. While this intensified the intrusion, we do not base our holding on the use of this optical aid. The same effect could have been achieved with a normal lens at a lower altitude, and the task of deciding what distance, real or artificial, the surveillance must maintain is an impossible one, at least on current information. As Karo suggests, where intrusions on presumptively private areas are concerned, we must err, if at all, on the side of caution and simplicity.

Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.