KAHN, J.
We have for review a trial court order suppressing, on Fourth Amendment grounds, certain evidence in the State’s prosecution of appellee Amanda Butler for second-degree murder and aggravated child abuse. We reverse, because we conclude the court erroneously determined the Fourth Amendment applied to the conduct that led to discovery of the incriminating information.

I. BACKGROUND

Appellee, the State has alleged, suffers from Munchausen syndrome by proxy, a psychiatric disorder whose sufferers — predominantly young mothers — factitiously induce illness in their young children, often to draw attention to themselves. See generally Michael T. Flannery, Munchausen Syndrome By Proxy: Broadening the Scope of Child Abuse, 28 U. Rich. L. Rev. 1175, 1182 (1994); see also Storck v. City of Coral Springs, 354 F.3d 1307,1309 (11th Cir.2003) (defining this syndrome as “a psychological disorder in which a person fabricates symptoms of illness in her child *244 for the purpose of gaming the attention of medical personnel”). Symptoms most commonly induced among child-victims include apnea and seizures. Flannery, supra, at 1185-86.
On numerous occasions between 1999 and 2002, appellee brought her young daughter, Cheyenne, to a Jacksonville hospital emergency room and reported the child was suffering from seizures. Cheyenne’s doctors, however, never diagnosed any clinical disorder or disease that would have caused the reported symptoms, despite extensive examinations and diagnostic testing. On February 5, 2002, appellee once more brought Cheyenne to the emergency room, reporting the child had suffered another seizure and that she was unresponsive. This time, however, doctors and nurses were unable to revive Cheyenne, and she died at the age of two. An autopsy did not identify a natural cause of death; rather, it tended to suggest Cheyenne died of asphyxiation.
The State brought no charges immediately after Cheyenne’s death. In 2003, appellee moved with her family to West Virginia, where she gave birth to another child, Ryley. Shortly after Ryley’s birth, Butler began bringing him to a hospital in Huntington, West Virginia, reporting symptoms similar to those she reported during Cheyenne’s emergency room visits in Florida. A Jacksonville detective, who investigated Cheyenne’s death, wrote in his report that, “[a]s with Cheyenne, ... Butler was the only adult present when the seizures occurred.”
Unable to attribute Ryley’s reported symptoms to any clinical cause, perplexed doctors in Huntington grew increasingly suspicious that Butler was abusing the child. Pursuant to apparent hospital policy, Ryley’s physicians eventually contacted an assistant prosecutor in West Virginia, who sought court permission to conduct video surveillance of Ryley while he was hospitalized.
In an unsworn “petition” filed with a trial court in West Virginia under the case style “In the Interest of Ryley Butler,” the assistant prosecutor summarized diagnostic efforts to date and reported that a team of specialists were unable to find “any disease or condition that would cause the reported seizures.” The petition also reported that one of Ryley’s doctors “feared that the child’s mother would cause the death of the child is [sic] she were not stopped.” The prosecutor did not attach any affidavits supporting the factual claims asserted in the petition, but sought authorization for
the State of West Virginia ... to enter Cabell Huntington Hospital for the purpose of videotaping persons within room 5302, or such other room or rooms as the child may be located in ... and to observe through video surveillance the actions of persons who come into contact with the child, to establish an explanations [sic] for any reported symptoms of illness ... whether induced by an individual or misrepresented to medical personnel as false symptoms or evidence of illness or injury.
The West Virginia court granted the petition. The resulting order authorized the State,
by and through its agents, including, but not limited to law enforcement officers, child protective service workers, and personnel from the [prosecuting attorney’s office], as well as medical professional personnel and security and social staff at Cabell Huntington Hospital, to videotape and observe through video surveillance the activities of Ryley Butler and his parents, while at Cabell Huntington Hospital, seeking an explanation for any actions that would indicate how the purported signs of illness *245 and/or injury to Ryley Butler are manifesting themselves....
The order also authorized the State of West Virginia “to take immediate custody of the child ... if the child is deemed to be in imminent danger.”
On authority of the order hospital staff moved Ryley from the intensive care unit to a private pediatric room in which four hidden cameras were fixed on the child’s hospital bed and an adjacent recliner. The cameras were linked to a closed-circuit television, which hospital security officer Zachary Smith monitored during the night of October 27-28, 2003. Nurses asked Butler to stay with the child overnight; Butler represented in the suppression motion at issue that a nurse told her, “We need you to be with the baby.” The State does not dispute that Butler was urged to stay with the child overnight. No dispute exists as well that Butler was not aware of the surveillance, that the door to Ryley’s room remained closed while Ryley and ap-pellee were inside, that nurses came in and out during the night, and that an apnea monitor was attached to Ryley.
Butler averred in the suppression motion that Smith, the security guard monitoring the closed-circuit feed from the room, saw Butler “place something over Ryley’s nose and mouth” and “called Nurse Rebecca Salyers and said, ‘Go into the room now.’ ” Salyers entered the room and “made observations and talked with Ms. Butler,” according to the factual allegations in Butler’s motion to suppress. Appellee was later arrested in West Virginia and prosecuted for child abuse.
In 2006, following Florida’s investigation of Cheyenne’s death, the State charged appellee with one count of second-degree murder and one count of aggravated child abuse. The State immediately filed notice of its intent to introduce, at trial, surveillance footage from Ryley’s West Virginia hospital room as well as Smith’s and Sal-yers’ testimony relating to the incident with Ryley.
Appellee moved to suppress that evidence. Following a hearing, the trial court granted appellee’s motion to suppress, finding that “the surveillance was conducted not for the purpose of treating the child, but for the purpose of investigating whether his mother was abusing him,” and that “the surveillance never would have occurred but for the court order authorizing the same.” Likening Ryley’s hospital room to a hotel room, the court concluded that appellee had a reasonable expectation of privacy in the room. The court suppressed the surveillance footage as well as Smith’s and Salyers’ testimony.
The State has appealed the suppression order, challenging the trial court’s finding of state action and the court’s conclusion that appellee had a reasonable expectation of privacy. For the reasons that follow, we reverse.

II. ANALYSIS

The Fourth Amendment provides, in relevant part, “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” Amend. IV, U.S. Const. The Framers did not, however, create protections that simply hang in the ether, reaching down to cover every interaction that results in someone’s discovery of incriminating information about someone else. Rather, “the application of the Fourth Amendment depends on whether the person invoking its protection can claim a ‘justifiable,’ a ‘reasonable,’ or a ‘legitimate expectation of privacy’ that has been invaded by government action.” Smith v. Maryland, 442 U.S. 736, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

*246
A. State Action

One seeking the exclusion of evidence as the fruit of an unreasonable search must demonstrate, first, that the government perpetrated the intrusion that led to the discovery of incriminating information. See id.; Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We find state action in this case.
When deciding whether the Fourth Amendment applies to particular conduct, Florida courts appear to have agreed with the Ninth Circuit’s view of state action, which is present when (1) “a private party acts as an ‘instrument or agent’ of the state in effecting a search and seizure,” and the government knows of and acquiesces to the conduct, and (2) the search is conducted solely in pursuit of a governmental interest, rather than the private actor’s self-interest. Treadway v. State, 534 So.2d 825, 827 (Fla. 4th DCA 1988) (quoting United States v. Walther, 652 F.2d 788 (9th Cir.1981)); accord United States v. Koenig, 856 F.2d 843 (7th Cir. 1988) (inquiring (1) whether the government knew about and acquiesced to the intrusive conduct, and (2) whether the private party acted in self-interest or to assist the government in obtaining incriminating information).
Here, the West Virginia court order listed several groups of state officials who were authorized to set up video surveillance in Ryley Butler’s hospital room. The order conferred the same power upon hospital staff. Appellee argues the order designated hospital staff as “agents” of the state; the State argues the order referred to certain state officials as “agents” and, after a conjunctive clause, referred separately to hospital staff. The distinction is not dispositive, however, because the order conferred the same power upon hospital staff that it conferred upon law enforcement officers and other state officials: the power “to videotape and observe through video surveillance the activities of Ryley Butler and his parents.”
We cannot help but find, as the trial court essentially found, that hospital staff were motivated by a desire to operate under a cloak of state authority in conducting the surreptitious surveillance at issue. The West Virginia court’s broad delegation to hospital staff of the power to conduct video surveillance, together with its authorization for the State of West Virginia to take immediate custody of Ryley if the surveillance showed he was in danger, leads us to the unavoidable conclusion that the surveillance here was undertaken pursuant to state action. The discussion will always return to an inescapable conclusion: the hospital desired to act at the state’s behest, and did so. We find the state’s involvement here minimal, but sufficient to trigger a further Fourth Amendment analysis.

B. Reasonable Expectation of Privacy

We next address the question of whether the state action in this case amounted to a search for Fourth Amendment purposes. We conclude it did not.
A precept of search-and-seizure jurisprudence is that “the Fourth Amendment protects people, not places.” Katz, 389 U.S. at 351, 88 S.Ct. 507. An individual’s Fourth Amendment protections crystallize when he or she “can claim a ‘justifiable,’ a ‘reasonable,’ or a ‘legitimate expectation of privacy’ that has been invaded by government action.” Smith, 442 U.S. at 740, 99 S.Ct. 2577. Analysis of whether the individual’s expectation of privacy is legally sufficient involves “[t]wo discrete questions.” Id. “The first is whether the individual, by his conduct, has ‘exhibited an actual (subjective) expectation of privacy....’” Id. (quoting *247 Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)). “The second question is whether the individual's subjective expectation of privacy is ‘one that society is prepared to recognize as “reasonable” ’ .... ” Id. (quoting Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)).
With a few significant exceptions, patients admitted to private hospital rooms may reasonably expect that law enforcement will not search their belongings. In Jones v. State, the Florida Supreme Court held that an admitted patient reasonably expected that police officers would not enter his room and collect his clothing and personal effects for forensic testing in a murder investigation. 648 So.2d 669, 677 (Fla.1994). The court reasoned that,
[wjhile Jones could expect that hospital personnel would enter his room to perform routine hospital procedures, and that members of the public would be allowed to visit him in his room if he did not object, Jones’ [sic] had no reason to believe that third parties would enter his room to look for and seize his personal property. Under the circumstances present here, this is an expectation we believe society is prepared to recognize as reasonable.
Id. (internal citations omitted). The more private the treatment space, the more reasonable the patient’s expectation of privacy with respect to official activity. Compare id. (finding reasonable expectation of privacy in private hospital room) and Morris v. Commonwealth, 208 Va. 331, 157 S.E.2d 191, 194 (1967) (analogizing admitted hospital patient’s expectation of privacy with that of a hotel guest) with Buchanan v. State, 432 So.2d 147, 148 (Fla. 1st DCA 1983) (finding no expectation of privacy in emergency room examination area enclosed by curtains, “where medical personnel were constantly walking in and out and where [patient] could have expected to remain only a few hours at most”).
The Ninth Circuit has held, however, that not even a patient has a reasonable expectation of privacy in diagnostic tests that reveal incriminating information. United States v. George, 987 F.2d 1428, 1432 (9th Cir.1993). The court in George concluded that the government complied with the Fourth Amendment when police officers arrested and searched the excrement of an emergency room patient after his abdominal x-rays, which hospital staff shared with an investigating officer, revealed narcotics-filled balloons in the patient’s stomach. Id. at 1430, 1432.
Courts also recognize that constantly evolving medical technology means a trip to the hospital today promises substantially more monitoring and attention than it did forty years ago. As the Michigan Court of Appeals observed,
Patients who are drugged or comatose, patients who are in critical condition or attached to life-support systems, patients who are frightened or depressed or young or old require monitoring. Indeed, any person who needs to be hospitalized requires monitoring. No one who had ever spent any time in a hospital room could continue to harbor any false expectations about his personal privacy or his ability to keep the world outside from coming through the door.
People v. Courts, 205 Mich.App. 326, 517 N.W.2d 785, 786 (1994).
We do not read Jones or any analogous authority to create an unbending and unequivocal rule that individuals within hospital rooms invariably have reasonable and broad expectations of privacy. Such a reading would be counter to the dictate of Katz that “the Fourth Amendment protects people, not places.” Katz, 389 U.S. at 351, 88 S.Ct. 507. Instead, the case law emphasizes that the objective reasonable *248 ness of an expectation of privacy in a hospital setting turns on the particular circumstances of each case. See, e.g., State v. Stott, 171 N.J. 343, 794 A.2d 120, 127 (2002) (noting that “a patient admitted for long-term care may enjoy a greater expectation of privacy than one rushed to an emergency room and released that same day. Moreover, the nature or scope of the privacy interest may differ depending on the facts and circumstances of a given case.”); People v. Brown, 88 Cal. App.3d 283, 151 Cal.Rptr. 749, 754 (1979) (observing that “the question of privacy in a hospital does not merely turn on a general expectation of privacy in use of a given space, but to some degree depends on the person whose conduct is questioned .... [A] patient may well waive his right of privacy as to hospital personnel, [but] it is obvious that he has not turned ‘his’ room into a public thoroughfare.”).
The surveillance at issue here occurred in a type of space in which, under some circumstances, individuals have held reasonable expectations of privacy, but that alone does not mean appellee’s expectation was reasonable in this case. See Katz, 389 U.S. at 351, 88 S.Ct. 507; accord Brown, 151 Cal.Rptr. at 754 (observing that “the question of privacy in a hospital ... to some degree depends on the person whose conduct is questioned”). We find the trial court erred by apparently concluding that society is prepared to recognize as reasonable appellee’s expectation that her interactions with her heavily monitored and very sick child in a hospital bed would remain private.
First, no record evidence supports the conclusion that appellee’s presence in her son’s room was so established that she would reasonably have regarded the room as affording her a quantum of privacy equivalent to that she would expect in a hotel room. In fact, although nurses brought meals to Butler in the room, Butler alleged in her motion to suppress that hospital staff urged her to stay overnight, suggesting it was no foregone conclusion that she would stay in the room at all.
Moreover, although Jones teaches that a patient reasonably has an expectation of privacy with respect to personal effects in a private room, we reject appellee’s contention that a visitor-even if she is the mother of an infant patient — may reasonably claim an equally broad expectation in the same space with respect to her actions that directly affect the patient’s health. Undisputed evidence of record established that Ryley was connected to an apnea monitor set to alert nurses if he stopped breathing, that nurses routinely came in and out of the room, and that physicians, at Butler’s request, strove to diagnose Ry-ley’s condition. Appellee herself repeatedly brought Ryley to the hospital, beseeching personnel to diagnose (and presumably cure) the reported symptoms. Under these circumstances, even though appellee did not know about surveillance, she would have expected that efforts to interrupt Ry-ley’s breathing would have triggered a medical response. Conversely, she could not have reasonably expected privacy in her actions affecting the health and well-being of a heavily monitored patient, in whom doctors and nurses had theretofore invested a tremendous amount of attention and labor. Understandably, the dissent cites Judge Posner’s opinion in United States v. Torres for the proposition that “[television surveillance is identical in its indiscriminate character to wiretapping and bugging,” but “is even more invasive of privacy.” 751 F.2d 875, 885 (7th Cir. 1984) (emphasis in original). The surveillance here was not, however, indiscriminate. Further, the law directs us to consider, among other things, the subjective expectations of the person under surveillance. See Smith, 442 U.S. at 740, 99 S.Ct. *249 2577; accord Katz, 389 U.S. at 351, 88 S.Ct. 507 (noting that “the Fourth Amendment protects people, not places”). Butler had to expect that personnel were monitoring Ryley’s physical well-being, and with appropriate medical skill and diligence.
We emphasize that our conclusion regarding the reasonableness of appellee’s expectation of privacy is limited to the peculiar and, fortunately, rare facts presented in this case. Our opinion by no means stands for the proposition that the Fourth Amendment permits the government to set up video surveillance in private hospital rooms indiscriminately. That, quite simply, is not the question confronting us. We merely hold that, as to appel-lee’s interactions with her son in the circumstances presented here, she did not have a reasonable expectation of privacy. Because no search in the constitutional sense occurred, Butler’s right to be free from unreasonable searches has not been implicated.

III. CONCLUSION

Finding state action underlying the surveillance at issue here, we nevertheless decline to conclude that appellee held a reasonable expectation of privacy in her son’s hospital room. We therefore REVERSE the suppression order and REMAND for further proceedings. We express no opinion on the subsequent admissibility of the evidence at issue under the evidence code.
VAN NORTWICK, J., concurs, and PADOVANO, J., dissents with opinion.